UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DGD PROCESSING SOLUTIONS, LLC,

    Plaintiff/Counter-Defendant,

vs.

Case No. 14-CV-13740

HON. GEORGE CARAM STEEH

MD FINANCIAL, LLC, and
MICHAEL D'AMBROSE,

    Defendants/Counter-Plaintiffs,

and

SPEEDY SERVICING, INC.,

    Plaintiff-Intervenor.
_____/

ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST MD FINANCIAL AND MICHAEL D'AMBROSE [DOC. 48] AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AGAINST SPEEDY SERVICING [DOC. 49]

    This case concerns automatic clearing house ("ACH") payday lending. Payday lenders provide credit on a short-term basis for consumer borrowers typically excluded from traditional banking services. MD Financial is a company that makes payday loans directly, as well as contracting with customers that make payday loans. DGD entered a Payment Facilitation Agreement ("PFA") with MD Financial for DGD to be the exclusive processor of ACH transactions for MD Financial for a minimum of two years. One month into processing files, DGD informed MD Financial that it lost its relationship with Talmer Bank. DGD assured MD Financial that it would be in a position to process the ACH files with another bank soon. MD Financial stopped submitting ACH files to DGD.

MD Financial took the position that DGD was in material breach of the PFA, which gave MD Financial a basis to rescind the PFA. DGD filed this lawsuit on the ground that MD Financial was in material breach of the PFA, improperly terminated the PFA and is liable for contract damages.

DGD was formed as a limited liability company on April 25, 2014 specifically to process MD Financial's files. DGD and another company that does ACH processing, GLRU, are both owned by Dennis Spencer. DGD and MD Financial entered into the PFA on April 28, 2014, whereby DGD would serve as the exclusive processor and collection agent of ACH transactions to and from the accounts of MD Financial's employees, customers, vendors or clients ("customers"). (PFA, 2a). Michael D'Ambrose is the president of MD Financial and signed the PFA on behalf of the company. MD Financial agreed to provide monthly processing commitments of $10 million in credit transactions and $30 million in debit entry transactions. (PFA Appendix A, p. 16). MD Financial promised these monthly volume commitments in order to obtain a decrease in the fees it would be charged under the PFA. (Answer at ¶ 41; D'Ambrose dep. p. 97). The PFA provides that MD Financial had a 60 day Ramp-Up Period to build to these volumes. Once the Ramp-Up Period had passed, fees were to be paid as follows:

> Subsequent to the Ramp-Up Period and for the remainder of the Term, Processor shall be entitled to the greater of: 1) Fees (as set forth above and collectively defined in the Recitals) applied to actual Debit and Credit Entry Volume or 2) Fees (as set forth above and collectively defined in the Recitals) applied [] Client's Debit and Credit Entry Volume Commitments.

(PFA Appendix A, p. 16). The two-year term of the PFA began to run on the first day of the month following the latter of the effective date of the agreement, the date the first credit or debit is processed, or the end of the 60-day Ramp-Up Period. (PTA § 10(a)).

MD Financial's loan portfolios were based on a 2-week loan cycle, which required expeditious processing and reporting. (D'Ambrose Decl. ¶ 16). In recognition of this fact, the PFA provides that "[the parties agree that 'time is of the essence' with respect to processor's performance and in order to avoid additional charges or expenses that can be incurred by either party." (PFA, § 2(b)).

In order to process ACH transactions, DGD had to be affiliated with an Originating Depository Financial Institution ("ODI"). The PFA did not specify a particular ODI or limit DGD to using just one ODI to process ACH transactions for MD Financial. (D'Ambrose dep. p. 56). The PFA required that MD Financial was the originator who initiated the ACH transactions, that unauthorized transactions would not exceed .6% and that the return rate would not exceed 20%. (D'Ambrose dep. p. 66). Mr. D'Ambrose signed a personal guarantee purporting to guarantee the performance of MD Financial.

DGD began processing MD Financial's debit transaction files on or about May 5, 2014. Shortly thereafter, the files were generating return rates in excess of the 20% allowed under the PFA. Talmer Bank, the ODI, suspended DGD's ACH capabilities. Talmer's Treasury Management Services Agreement allowed it to terminate or suspend ACH services if necessary to comply with U.S. laws and regulations. Brad Kolky, Associate Director of Talmer's Treasury Management Services, testified that Talmer originally understood that GLRU and DGD were originating ACH transactions, not acting as a third-party processor for a payday lender. (Kolky dep., pp. 111-12). GLRU and

DGD each posted a $50,000 CD with Talmer as security for ACH transactions processed through the bank. Talmer imposed a $50,000 ACH daily debit origination limit on GLRU and DGD, meaning that they could not submit more than $50,000 of debit transactions each day. (Kolky dep., p. 92). DGD allegedly did not disclose this daily debit limit to MD Financial.

GLRU started processing for its only customer, Cover One, on April 3, 2014. DGD started processing for its only customer, MD Financial on May 5, 2014. Over a 3-week period of time from May 1 to May 23, 2014, Talmer calculated weekly return averages over 20% and unauthorized transactions over 0.6%. In mid-May of 2014, Talmer sent third-party payment processor questionnaires to GLRU and DGD, inquiring whether these companies were third-party processors of ACH transactions. Dennis Spencer completed and returned the forms for GLRU and DGD on May 20, 2014. DGD's questionnaire confirmed that DGD was third-party processing, stating that it was processing ACH transactions for "Medical" billing and general clients. DGD did not disclose that it had only one customer, which was a payday lender client. Talmer was unaware that GLRU and DGD were third-party processors until this time.

GLRU was processing a much higher volume of returns than DGD was at this time. Talmer's fraud team began to investigate GLRU. An internal email states: "We need to know who the customers [] are and the risk of giving credit and allowing debits against the returning ACHs. A Third Party Processor with a lot of returns looks like a Ponzi scheme, paying out what comes in against what is being returned from yesterday's credits." (Talmer internal email dated May 23, 2014).

Talmer mailed formal termination notices to GLRU and DGD on June 3, 2014.  Each notice indicates Talmer would not process any further ACH transactions after June 9, 2014 and all accounts would be closed on September 8, 2014.

On June 5, 2014, DGD's owner, Dennis Spencer, informed MD Financial that Talmer was suspending ACH services "which is directly attributable due to the excessive returns on the initial MD Financial file runs", but that DGD would be able to move MD Financial to another ODFI shortly.  The email concluded by stating, "As an initial matter I am recommending against processing further files with Talmer (as they will hold the funds should we do so)."  On June 27, 2014, DGD wrote to inform MD Financial that it failed to meet the monthly volume commitments and that it submitted files that exceeded the return and unauthorized limits under the PFA.  DGD requested a meeting to establish a timeline and plan for MD Financial to meet its obligations under the PFA as well as under the Personal Guarantee.  D'Ambrose responded that the PFA contained a Ramp-Up Period that was never reached, therefore MD Financial did not have any obligations and the PFA was void.

Once litigation began, MD Financial took the position that DGD breached the PFA when it lost its relationship with Talmer Bank and had no other ODFI to perform ACH services.  According to MD Financial, this alleged material breach by DGD permitted MD Financial to rescind the PFA.

In discovery in this litigation, DGD submitted the Declaration of Michael Tozman, owner and manager of Epic Capital Group ("Epic").  Like DGD, Epic was a third-party processor that processed ACH transactions through ODFIs.  (Tozman Decl., ¶ 3).  Epic allegedly had a joint venture relationship with GLRU, the other ACH processing company

owned in part by Dennis Spencer. Mr. Tozman explained that DGD could have used GLRU's joint venture with Epic to process MD Financial's ACH transactions "subject to negotiating agreed upon terms". (Tozman Decl., ¶ 6). DGD also submitted an agreement it allegedly signed on May 2, 2014 with Epic, whereby DGD and Epic agreed that each entity could use the ODFI relationships of the other to process ACH transactions. There is no evidence that DGD informed MD Financial of its ability to use EPIC's ODFI.

Plaintiff-Intervenor Speedy entered into an Agreement with MD Financial, whereby Speedy was the ACH Originator and MD Financial was a third party ACH Processor. MD Financial then entered the PFA with DGD in order to subcontract its processing of ACH transactions for Speedy to DGD. In its Agreement with MD Financial, Speedy was required to maintain a reserve balance in a reserve account to be held in escrow by MD Financial for the term of the Agreement and a period of 90 days after the termination of the Agreement. Likewise, pursuant to the PFA, MD Financial was required to maintain a reserve balance in a reserve account to be held in escrow by DGD for the term of the PFA and a maximum period of 180 days after the termination of the PFA. The reserve accounts in each case were to cover potential losses from ACH transactions. In addition, the Agreement required that processed funds were to be deposited by MD Financial in the Settlement Account owned by Speedy. The PFA similarly provided that processed funds were to be deposited in a Consolidated Account and after the applicable holding period would be transmitted to MD Financial's Client Settlement Account. When Talmer closed DGD's processing accounts, it returned all

funds from the reserve account and ACH transaction funds remaining in the accounts to DGD.

MD Financial and DGD could not reach an agreement on their respective rights and obligations under the PFA. DGD attempted to bypass MD Financial and deal directly with MD Financial's customer, Speedy. As part of the proposed relationship, DGD would return to Speedy "100% of the funds you are seeking from MD Financial, LLC." (Emails between Speedy and DGD, doc. 52, Ex 3, pp. 15-16). Ultimately a deal between Speedy and DGD was not reached.

On September 26, 2014, DGD filed this lawsuit against MD Financial and D'Ambrose, claiming breach of the PFA and breach of the personal guarantee. DGD seeks $22 million in "guaranteed" damages against both defendants. On November 17, 2015, MD Financial filed a counterclaim for DGD's breach of the PFA for failing to provide a new ODFI, failing to timely report all processed loan transactions, and failing to timely settle and distribute funds to MD Financial as required by the PFA. MD Financial also asserted a claim for conversion.

On April 6, 2015, the court granted Speedy's motion to intervene. In its Intervenor Complaint, Speedy asserts it directly contracted with MD Financial for ACH processing services, and was also an intended third party beneficiary of the PFA. Speedy alleges that it has not received proceeds totaling $664,272.75 for debit transactions it sent through MD Financial to DGD for processing. Speedy contends that it cannot state with specificity the exact amounts held in DGD's reserve account which pertain to its transaction. Count One of the Intervenor Complaint seeks injunctive relief preventing DGD and MD Financial from using the funds belonging to Speedy in any way and

ordering the funds to be maintained in a separate account pending further order of the court. Count Two asserts breach of contract against MD Financial. Count Three asserts breach of the covenant of good faith and fair dealing against DGD and MD Financial. Count Four asserts conversion, Count Five asserts unjust enrichment, and Count Six seeks an accounting against DGD and MD Financial.

## STANDARD FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Redding v. St. Eward*, 241 F.3d 530, 532 (6th Cir. 2001). The Supreme Court has affirmed the court's use of summary judgment as an integral part of the fair and efficient administration of justice. The procedure is not a disfavored procedural shortcut. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986); *see also Cox v. Kentucky Dept. of Transp.*, 53 F.3d 146, 149 (6th Cir. 1995).

The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Amway Distributors Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (*quoting Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Redding*, 241 F.3d at 532 (6th Cir. 2001). "[T]he mere existence of *some* alleged

factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphasis in original); *see also National Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 270 (1968); *see also McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. *Anderson*, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. *McLean*, 224 F.3d at 800 (*citing Anderson*, 477 U.S. at 252).

## ANALYSIS

### I. Breach of Contract Law

"The rule in Michigan is that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Flamm v. Scherer*, 40 Mich. App. 1, 8-9 (1972). Any failure to perform a contractual duty that has become absolute constitutes a breach. *Woody v. Tamer*, 158 Mich. App. 764, 771 (1987) (citing to Restatement of Contracts 2d). The non-breaching party may rescind a contract only if there is a material breach by the other party that affects a substantial or an essential part of the contract. *O'Conner v. Bamm*, 335 Mich.

438, 444 (1953). Where there has been substantial performance of the contract by a party acting in good faith, the nonbreaching party may not rescind or cancel the contract, but instead has only a claim for damages. *Michaels v. Amway Corp.*, 206 Mich. App. 644, 650 (1994).

II. <u>First Material Breach</u>

In its breach of contract count, DGD alleges that MD Financial breached the PFA by not submitting ACH files as required, and by improperly claiming the PFA was void and therefore terminated. Pursuant to the terms of the PFA, MD Financial was obligated to submit ACH debit and credit transactions to DGD and DGD was in turn obligated to process those transactions for MD Financial for a fee. After Talmer Bank suspended DGD's ACH services, DGD informed MD Financial and assured them that DGD would be able "to move our clients, including MD Financial, to another ODFI shortly . . . . As an initial matter I am recommending against processing further files with Talmer (as they will hold the funds should we do so)."

On June 27, 2015, a date identified by DGD as the end of the Ramp Up Period, DGD wrote to MD Financial stating that DGD expected MD Financial to meet its contractual obligations under the PFA and the Personal Guarantee signed by Mr. D'Ambrose. MD Financial responded on June 30, 2015 that the contract was void because the parties never made it to the end of the 60 day Ramp Up Period.

DGD argues that it has submitted undisputed evidence via the Declaration of Mr. Tozman and the joint venture agreement between DGD and Epic that DGD would have and could have performed the PFA by using Epic's ODFI to process MD Financial's ACH's of $30 million in debt transactions and $10 million in credit transactions per

-10-

month.  Mr. Tozman's statement is that Epic would have processed the ACH's for DGD "subject to negotiating agreed upon terms", which indicates that there was not an actual agreement in place.  Even if there was a joint venture agreement between DGD and Epic, there is no evidence that EPIC had a relationship with an ODFI, or that such ODFI would have agreed to process DGD's third-party ACH transactions.  The biggest problem is that there is no evidence that DGD communicated to MD Financial that a new ODFI relationship was in place and MD Financial should resume submitting files to DGD.

DGD maintains that MD Financial's refusal to perform under the PFA, and its rescission of the PFA, resulted in an improper termination.  Paragraph 10(c) of the PFA provides:

> If [MD Financial] terminates this Agreement without the required notice, [MD Financial] authorizes [DGD] to debit the Security Deposit, Consolidation Account, Settlement Account and Reserve (the "Accounts") for an amount equal to the Client's average monthly Fees for each month, or fraction thereof, of the remaining Term as well as the full amount of the Reserve.

DGD contends that MD Financial never gave DGD notice of a material breach, or an opportunity to cure, and never demanded performance from DGD.  Under Michigan law, a party may not suspend performance or rescind a contract unless the other party has materially breached the contract.

As the above discussion demonstrates, there are many issues of material fact with respect to which party breached the PFA first that prevent the court from granting summary judgment to DGD.  DGD's motion for summary judgment as to the allegations of breach of contract against MD Financial is denied.  If there is definitive evidence

supporting one side or the other in this case, it has not been identified to the court in the papers submitted.

III. Breach of the Personal Guarantee

Mr. D'Ambrose appears to have personally guaranteed the full, prompt and complete performance of MD Financial under the PFA. He may be therefore liable for damages due to MD Financial's breach of the PFA, if the court finds such a breach. As there are issues of material fact remaining to be resolved, DGD's motion for summary judgment as to Mr. D'Ambrose is denied.

IV. MD Financial's Counterclaims

MD Financial filed a counterclaim against DGD for breach of contract and conversion. The breach of contract claim alleges that DGD breached the PFA by failing to process ACH files. DGD responds that it was ready, willing and able to process ACH files for MD Financial and that MD Financial breached the PFA because it refused to perform when it stopped sending files and wrongfully rescinded the PFA. As discussed in relation to DGD's breach of contract claim, there are issues of material fact that make summary judgment improper.

DGD argues that MD Financial's conversion count fails because DGD was contractually entitled, pursuant to Section 10(c) of the PFA, to debit the accounts of MD Financial for the fees it was owed for the remainder of the term of the contract. Because the question of which party breached the contract first is unresolved, summary judgment on MD Financial's conversion claim is denied.

V. <u>DGD's Motion for Summary Judgment Against Intervenor Speedy</u>

Speedy and MD Financial entered into a Company Agreement for ACH Origination ("Agreement") on February 24, 2014. In this Agreement, Speedy contracted with MD Financial for ACH processing services. Mr. D'Ambrose admitted that the representation in the Agreement that MD Financial was a third party processor affiliated with one or more ODFIs was not true. (D'Ambrose dep. 165). In fact, MD Financial did not have a contractual relationship with an ODFI to provide ACH processing services when it signed the Agreement with Speedy. Two months later, MD Financial subcontracted the ODFI services from DGD.

Speedy claims that when the PFA failed, some or all of the money DGD debited from MD Financial's accounts actually belonged to Speedy. DGD moves for summary judgment on the ground that there was never a contract between DGD and Speedy to process ACH transactions for Speedy's customers. Speedy admits that it's contract was with MD Financial, but contends that it was a third party beneficiary of the PFA between MD Financial and DGD.

If Speedy was a third party beneficiary of the PFA, then under Michigan law Speedy would be entitled to enforce the terms of the PFA as if it was made directly between Speedy and DGD. "Any person for whose benefit a promise is made by way of contract, as hereinafter defined, has the same right to enforce said promise that he would have had if the said promise had been made directly to him as the promisee." MCL § 600.1405.

It is the "Legislature's intent to assure that contracting parties are clearly aware that the scope of their contractual undertakings encompasses a third party, directly

referred to in the contract, before the third party is able to enforce the contract." *Shay v. Aldrich*, 487 Mich. 648, 663 (Mich. 2010). A third party may be a member of a class, so long as that class is sufficiently described such that the contracting parties are still within the general rule that the parties are "clearly aware" of the scope. *Id.* at 664-65.

The PFA states that DGD, as Processor, provides ACH services "on behalf of clients to and for client's Customers as a "Third-Party Processor"". (PFA Recitals, ¶ 2). MD Financial, as Client, initiates ACH transactions for deposit or collection to and from the accounts of Client's customers maintained at Participating Depository Financial Institutions ("DFI") by means of the ACH Network. (PFA Recitals, ¶ 3). MD Financial argues that the PFA makes it clear that DGD agreed to process ACH files that originated with its "customers", such as Speedy. MD Financial also points out that after the PFA failed, DGD tried to work directly with Speedy to process its ACH files.

In this case, the parties were aware that DGD would be processing ACH transactions originated by MD Financial to and for MD Financial's customers. Exactly what DGD knew about MD Financial's customers and the terms of the relationship between MD Financial and its customers, however, is not clear from the evidence submitted on summary judgment. The court is not in a position to hold as a matter of law that Speedy was an intended third party beneficiary of the PFA.

1. <u>Implied Covenant of Good Faith and Fair Dealing</u>

"Michigan does not recognize an independent tort action for an alleged breach of a contract's implied covenant of good faith and fair dealing." *Ulrich v. Federal Land Bank of St. Paul*, 192 Mich. App. 194, 197 (1991). Courts in this state only recognize the implied covenant of good faith in the contract setting where one party to the contract

makes its performance a matter of its own discretion. *Stephenson v. Allstate Ins. Co.*, 328 F.3d 822, 826 (6th Cir. 2003). MD Financial argues that DGD had discretion, upon termination of the PFA, to hold funds in the reserve account for up to 180 days. (PFA, Appendix A p. 17). If Speedy was a third party beneficiary of the PFA, DGD owed a duty to Speedy to exercise its discretion in good faith regarding the reserve account.

A third party beneficiary stands in the shoes of the original promisee. *Shay*, 487 Mich. at 665-66. Therefore, in addition to determining whether Speedy is a third party beneficiary to the PFA, the fact-finder must also determine if DGD exercised wrongful dominion over MD Financial's Accounts. If MD Financial has no claim against DGD for the return of the funds, then neither does Speedy. In that case, any claim that Speedy has to the funds is one that must be made directly against MD Financial. Because there are issues of material fact as to Speedy's claim of breach of the implied covenant of good faith and fair dealing against DGD, DGD's motion for summary judgment is denied.

2. Conversion

Michigan law provides a cause of action for conversion under common law and statute. Conversion is generally defined as "any distinct act of dominion wrongfully exerted over another's personal property in denial of or inconsistent with the rights therein." *Foremost Ins. Co. v. Allstate Ins. Co.*, 439 Mich. 378, 391 (1992). Michigan statute provides a remedy to a person damaged by another's conversion of his property to the other person's own use. MCL § 600.2919a.

The PFA required that MD Financial was the originator of the ACH transactions processed by DGD, and that the funds were to be debited from the accounts of MD Financial's customers. If MD Financial was the first to breach the PFA, DGD was

contractually entitled to keep the funds pursuant to the terms of the PFA. (PFA ¶ 10(c)). If it is determined that DGD must return the funds, it would be to MD Financial and not to Speedy. As to DGD, Speedy's only claim to the withheld funds is as a third party beneficiary. For the reasons explained in the preceding section, DGD's motion for summary judgment on Speedy's conversion claim is denied.

### 3. Unjust Enrichment

The elements of a claim for unjust enrichment are (1) receipt of a benefit by the defendant from the plaintiff and (2) an inequity resulting to plaintiff from defendant's retention of the benefit. *Dumas v. Auto Club Ins. Ass'n*, 437 Mich. 521, 546 (1991). A contract will be implied only if there is no express contract covering the same subject matter. *Bellevue Ventures, Inc. v. Morang-Kelly Inv.*, 302 Mich. App. 59, 64 (2013).

Speedy alleges in its complaint that it "has performed pursuant to the terms of the PFA . . . which performance has resulted in commercial profits for the benefit of DGD . . . ." (Intervenor Complaint, ¶ 65).

Speedy acknowledges that it was not a direct party to the PFA, but as a third party beneficiary argues that DGD was aware that MD Financial could not support the commitment of $30 million in ACT transactions per month and knew that MD Financial would have to bring in additional portfolios to cover the amounts. (D'Ambrose dep. P. 172-73). While there was no express contract between DGD and Speedy to process Speedy's portfolio, DGD received a direct benefit from doing so and inequitably retains the benefit.

The court finds that Speedy survives summary judgment on its unjust enrichment claim.

    4.  <u>Accounting</u>

DGD asserts that it provided a complete accounting of all files processed for MD Financial under the PFA. This was admitted to by MD Financial's D'Ambrose in his deposition. (D'Ambrose dep. pp. 140-42). There is no similar admission by Speedy, so for now DGD's motion for summary judgment as to the claim for an accounting is denied.

CONCLUSION

For the reasons stated, DGD's motion for summary judgment as to MD Financial and Michael D'Ambrose and motion for summary judgment as to Speedy Servicing, Inc. are DENIED.

Dated: June 7, 2016

                                <u>s/George Caram Steeh</u>
                                GEORGE CARAM STEEH
                                UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
June 7, 2016, by electronic and/or ordinary mail.

<u>s/Marcia Beauchemin</u>
Deputy Clerk

---